James B. Ely and Mary W. Ely v. Commissioner.
Ely v. Commissioner
Docket No. 56220.
United States Tax Court
T.C. Memo 1960-142; 1960 Tax Ct. Memo LEXIS 146; 19 T.C.M. (CCH) 743; T.C.M. (RIA) 60142; June 30, 1960
*146 Held: (1) That $17,845.13 of the total amount received by petitioner upon his retirement or withdrawal from the Acuff Clinic, a medical partnership formed by petitioner and six other doctors in 1947, which retirement or withdrawal was made effective as of September 1, 1950, represents his pro rata share, less withdrawals, of the profits of the partnership for the period January 1 through August 31, 1950, and as such is taxable as ordinary income under the provisions of sections 22(a) and 182 of the Internal Revenue Code of 1939; (2) That the monthly payments on said amount received by petitioner in 1950, 1951, and 1952, are taxable in the years received, and (3) That petitioners are liable for additions to tax under section 294(d)(1)(A), but are not liable for any additions to tax under section 294(d)(2). Charles D. Snepp, Esq., Fidelity Bank Building, Knoxville, Tenn., and Myron R. Ely, Esq., for the petitioners. Jack D. Yarbrough, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax, additions to tax, and an overassessment in tax as follows: Additions to Tax
Sec.
Sec.
Over
Year
Deficiency
294(d)(1)(A)
294(d)(2)
Assessment
1950
$6,055.02
$748.68
$449.21
1951
220.10
146.73
$1,276.90
1952
1,521.48
An *147 order of this Court was entered on February 20, 1958, granting respondent's motion to dismiss this proceeding with respect to the year 1951 for lack of jurisdiction. Certain adjustments have been conceded by the parties. The following issues remain for decision: (1) Whether $17,845.13 received by petitioner James B. Ely in connection with his withdrawal from a partnership known as Acuff Clinic was ordinary income; (2) Whether the entire $17,845.13 was taxable to petitioners in the year 1950; (3) Whether petitioners are liable for additions to tax under section 294(d)(1)(A) and section 294(d)(2), Internal Revenue Code of 1939, for the year 1950. Findings of Fact The stipulated facts are so found and incorporated herein by this reference. The petitioners, James B. and Mary W. Ely, husband and wife, resided in Knoxville, Tennessee, during the years involved in this proceeding. James B. Ely, who is a duly licensed physician, will sometimes hereinafter be referred to as the petitioner. The petitioners filed their joint income tax returns for the years 1950 and 1952 with the collector or district director of internal revenue, Knoxville, Tennessee. The petitioners filed their income tax returns *148 on the cash receipts and disbursements basis. Petitioner was licensed to practice medicine in 1939. Prior to entering the Army in 1942, he practiced medicine with Herbert Acuff with offices in the Medical Arts Building in Knoxville, Tennessee. Petitioner returned to Knoxville in 1945 and resumed his practice with Acuff. Soon after petitioner's return, he and another doctor conceived the idea of establishing a medical clinic in Knoxville and convinced Acuff of the need therefor. They also interested several specialists in various medical fields, and sought a suitable location and building for the clinic. On May 30, 1946, petitioner and several other doctors, each in his individual capacity as lessee, executed a 20-year lease with a renewal option to a three-story building at 514 W. Church Avenue in Knoxville. Subsequently the lease was transferred to a partnership known as the Acuff Clinic, of which petitioner and six other doctors were members. The partnership became active on March 1, 1947. Pertinent portions of the partnership agreement dated March 1, 1947, are as follows: "THIS AGREEMENT made this 1st day of March 1947 between HERBERT ACUFF, KYLE C. COPENHAVER, BERGEIN M. OVERHOLT, *149 JAMES BARR ELY, WILLARD IRWIN, HARRY H. JENKINS and PARK NICELEY, all of the City of Knoxville, County of Knox and State of Tennessee. WITNESSETH "1. The parties hereby agree that they will become and be partners in the practice of the profession of medicine and surgery and in the maintenance and operation of a medical clinic for the diagnosis and treatment of disease and ministering to the sick. "2. The firm name of the partnership shall be "ACUFF CLINIC", and the name of the partnership shall not be changed except by the unanimous consent of all of the partners. "3. The place at which their partnership business will be carried on is at No. 514 West Church Avenue, Knoxville, Tennessee and at such other place or places as the partners may determine. "4. The term of the partnership shall begin on the 1st day of March 1947 and shall continue until June 1, 1966, unless dissolved prior thereto by mutual agreement. The partnership may likewise continue after June 1, 1966 by the mutual agreement of those partners constituting the partnership at such time. Neither the death of a partner, nor the withdrawal of a partner shall of itself dissolve the partnership, but the rights of the remaining *150 partners shall be as fixed herein. "5. That certain lease dated May 30, 1946 between Will D. Wright and wife, Helen Rolls Wright, Martha Wright McIntosh and husband, H. D. McIntosh, as Lessors, and Herbert Acuff, Kyle C. Copenhaver, Bergein M. Overholt, James Barr Ely, Willard Irwin and Harry H. Jenkins, as Lessees, covering the premises No. 514 West Church Avenue, Knoxville, Tennessee for the term of twenty (20) years from midnight May 30, 1946 shall be an asset of the partnership and the parties hereto as the present partners, and any future partners admitted to this partnership, shall be entitled to the benefits of said lease and shall be subject to the liabilities of said lease. "6. Each of the partners is to contribute to the partnership initial operating capital the sum of SEVENTY-FIVE HUNDRED ($7500.00) Dollars, the same to be repaid from surplus profits of this partnership, after proper allowances for debts and for sufficient operating funds. Each partner is to receive a promissory note of the "ACUFF CLINIC" for said sum so advanced and the said notes are to draw four percent (4%) interest from the date of the note and to be payable on or before three years after date. "7. *151 If additional capital other than the initial operating capital is needed, from time to time, then the Executive Committee of the "ACUFF CLINIC" will determine the amount of capital needed at any given time and whether such capital is to be raised by assessment of equal amounts against each of the partners, or by a loan from a banking institution in the name of the partnership. * * *
"11. It is recognized that the earning capacity of all of the partners are not now equal and accordingly it is anticipated that at the beginning certain partners will produce more income for the 'ACUFF CLINIC' than others, but that over the years it is contemplated the earning capacity of the partners will be equalized. It is, therefore, agreed that the net profits of the partnership will be divided among the partners during the first ten(10) years of the partnership in the following proportions: "1st
2nd
3rd
4th
5th
6th
7th
8th
9th
10th
yr.
yr.
yr.
yr.
yr.
yr.
yr.
yr.
yr.
yr.
"Acuff
39%
39%
37.5%
35.5%
34%
32.5%
29%
25%
20%
14-2/7%
Copenhaver
21%
21%
20%
19.5%
18.5%
17.5%
16%
15%
15%
14-2/7%
Ely
8%
8%
8.5%
9%
9.5%
10%
11%
12%
13%
14-2/7%
Irwin
8%
8%
8.5%
9%
9.5%
10%
11%
12%
13%
14-2/7%
Jenkins
8%
8%
8.5%
9%
9.5%
10%
11%
12%
12%
13%
14-2/7%
Niceley
8%
8%
8.5%
9%
9.5%
10%
11%
12%
13%
14-2/7%
Overholt
8%
8%
8.5%
9%
9.5%
10%
11%
12%
13%
14-2/7%
"Division *152 of the profits after the end of ten years will be on an equal basis. All fees and presents of money paid or given to any of the partners for professional services and the emoluments of every professional office or appointment now or hereafter held by the partners, or any of them, shall be partnership property. The compensation received by Herbert Acuff as a Director and Medical Advisor of the Pruden Coal Company of Knoxville is excluded and shall remain his individual property. "All property purchased by the Executive Committee for the use and operation of the 'ACUFF CLINIC' such as furniture, fixtures, furnishings, medical equipment, x-ray machine, surgical instruments and the like shall be considered as capital assets of the partnership. Capital assets shall at all times belong to the partners in equal shares. "12. All expenses, debts, losses or damages which shall be incurred in carrying on the partnership shall be borne and paid by and out of the funds of the partnership, and in case of deficiency thereof, by the partners in the same proportion as they would have shared net profits in the year when the said loss occurs. "13. At the end of each quarter, beginning with commencement *153 of the partnership, or oftener upon request in writing by a partner or partners entitled to as much as 25% of the profits at the time the request is made, an accounting of the assets and liabilities and profits and all partnership transactions shall be taken by the Executive Committee and the true condition of the partnership ascertained as far as possible, and each partner agrees to lend his aid and services to effect this objective. At the end of each quarter, if the books of said partnership disclose a balance of funds over and above all outstanding claims, then the Executive Committee shall distribute such surplus cash profits, less 10% reserve, to the partners in the proportion to which each partner is entitled to receive profits as provided in Section 11 above. The 10% reserve is to be retained in the partnership account and is to accumulate until such time as the Executive Committee, by a majority vote of the 'voting units', makes a disposition of such reserve. * * *
"16. Upon the termination of the partnership by lapse of time, or by the mutual agreement of the partners, or for any of the causes stated herein, a full and general account shall be taken of the assets, credits, *154 debits and liabilities of the partnership, and of the transactions and terms thereof, and with all convenient speed such assets and credits shall be sold, realized and collected by the Executive Committee, and the proceeds applied in paying and discharging such debts and liabilities and expense of winding up the partnership and subject thereto, in paying to each partner his share of the capital contributed and any unpaid profits which may have been credited to him and not withdrawn, and his share of the capital assets, and the balance thereafter of such proceeds shall be divided between the partners in the shares to which they are entitled to the net profits at the time of the termination of the partnership. Each partner shall execute and concur in all necessary and proper instruments, acts or things for effecting and facilitating the matters in this clause provided for and for the mutual release or indemnity of the partners. "17. Notwithstanding the death of any partner, the partnership between the surviving partners shall continue under these articles of partnership and if any partner shall die during the continuance of the partnership, the surviving partners shall as and from the *155 date of such death, succeed to the share of the deceased partner in the partnership assets, property and good will and the said surviving partners shall assume all the debts, liabilities and obligations of the partnership. Following the death of any partner an account and statement shall be taken and made out of his net share of the capital assets and effects of the partnership, and of all unpaid interest and profits belonging to him up to the time of his death, for which purpose a valuation shall be made of any assets or effects requiring a valuation and the amount so ascertained to be due and owing to the deceased partner shall be paid by the surviving partners to his representative as soon as may be convenient to the surviving partners, and in any case within twelve (12) calendar months from his decease, with interest from his decease until payment at the rate of four percent (4%) per annum. In determining the valuation of the deceased partner's share, it is agreed that no valuation shall be placed on the good will as a partnership asset, and that the active accounts receivable shall be computed at 75% of their face value, and that the equipment will be depreciated 10% per year *156 from date of purchase by the Clinic. In case of dispute as to the value of the share of the deceased partner, the parties shall resort to arbitration under the provision in that behalf hereinafter set forth. The surviving partners may elect not to purchase the share of a deceased partner and if such election is made, notice in writing to that effect shall be given to the personal representative of the deceased partner within sixty (60) days after his death and in that case the partnership shall be deemed to have terminated on the date of the giving of such notice, and thereafter the partnership shall be wound up as hereinabove provided in paragraph 16 for the termination of the partnership. In the meantime the 'ACUFF CLINIC' shall be deemed to have been carried on by the surviving partners for the joint account of themselves and the representative of the deceased partner. "18. Any partner may retire from the partnership after December 31, 1948 by giving six (6) months notice in writing to the other partners of his intention so to do, and at the expiration of such six (6) months notice, the partnership shall determine so far as regards the partner giving such notice, but not as between *157 the remaining partners. The payment to be made by the partnership to the retiring partner for his share, or the payment to be made by the retiring partner to the 'ACUFF CLINIC', as the case may be, shall be determined by the Executive Committee in the same manner as provided in paragraph 17 for determining the value of a deceased partner's share except that the Executive Committee shall determine the condition under which such retiring partner may be released from his obligation, to accrue in the future, under the lease referred to in paragraph 5 hereinabove. After the amount of payment due to such retiring partner shall have been thus determined, the partnership shall have two years from the date of the retirement of such partner within which to make such payment. * * *
"21. If at any time during the continuance of the partnership, or after the dissolution or determination thereof, any dispute, difference, or question shall arise between the partners or any of them, or their or any of their representatives touching the partnership or the accounts or transactions thereof, or the dissolution or winding up thereof, or the construction, meaning or effect of these presents, or anything *158 herein contained, or the rights or liabilities of the partners or their representatives under these presents or otherwise in relation to the premises, then every such dispute, difference, or question shall be referred to the arbitration of two disinterested persons, one to be appointed by each party to the reference, or of an umpire to be appointed by the arbitrators in writing; and if either party shall refuse or neglect to appoint an arbitrator within 15 days after the other party shall have appointed an arbitrator, and shall have served a written notice upon the first mentioned party requiring such party to make such appointment, then the arbitrator appointed as aforesaid shall, at the request of the party appointing him, proceed to hear and determine the matters in difference as if he were an arbitrator appointed by both parties for the purpose; and the award or determination which shall be made by the arbitrators, arbitrator, or umpire shall be final and binding upon the parties hereto respectively, and their respective executors, administrators and assigns. The parties hereto expressly agree that each waives any of his rights to bring any court proceeding to enforce his right *159 and consents to settle any differences by arbitration as provided herein, and they agree to accept such award and be bound thereby and such award shall be valid and enforcible unless the same shall be impeachable for fraud." * * *
The Acuff Clinic has at all times been located at Knoxville, Tennessee, in a three-story building designated as 514 W. Church Avenue, and the partners therein have engaged in the practice of medicine and surgery, and in the maintenance and operation of a medical clinic in connection therewith. The books and records of the Acuff Clinic for the years 1947 to 1950, inclusive, were maintained on a cash receipts and disbursements basis. The petitioner contributed $2,500 cash to Acuff Clinic on each of the dates October 15, 1946, January 16, 1947, and March 12, 1947. On each of said dates, he received a $2,500 promissory note from Acuff Clinic which bore interest at the rate of 4 per cent. These notes were credited to an account entitled "Investment - Notes" on the records of Acuff Clinic and this account was charged with $7,500 on May 16, 1950, the date the notes were paid by Acuff Clinic. On May 16, 1950, the petitioner was paid interest on these notes in the *160 amount of $1,008.53. The balance sheets of the information returns (Form 1065) filed by the partnership for the years 1947, 1949, and 1950, reflect that the total of the partners' capital accounts as of December 31st of each of said years equaled the total assets of the partnership less its liabilities. These facts, as well as petitioner's individual capital account as of December 31, 1948, and December 31, 1949, are shown in the following schedule: CONDENSED BALANCE SHEETS, ACUFF CLINIC
12-31-47
12-31-48
12-31-49
12-31-50
Total Assets
$238,713.13
$166,755.47
$193,201.55
$193,269.88
Total Liabilities
195,911.25
105,577.33
109,392.14
52,921.83
Total, Partners' Capital
42,801.88
61,178.14
83,809.41
140,348.05
Account
Petitioner's Capital Account
1,793.59
1,953.46
In the fall of 1949 petitioner decided to leave the partnership and on January 1, 1950, gave notice pursuant to the six-month requirement provided in the partnership agreement. At the time petitioner gave said notice he was, and had been since its formation, secretary of the partnership. Immediately after giving said notice he was removed from the position of secretary and thereafter had no official position with the partnership. In connection with *161 petitioner's withdrawal from the partnership on August 31, 1950, he and the remaining partners executed an agreement which in pertinent part is as follows: "THIS AGREEMENT made and entered into on this 31 day of August, 1950 by and between ACUFF CLINIC, a partnership which after September 1, 1950 will be composed of Herbert Acuff, Kyle C. Copenhaver, Bergein M. Overholt, Harry H. Jenkins, and E. Park Niceley, of the first part (hereinafter referred to as 'Acuff Clinic'), and JAMES BARR ELY of the second part, (hereinafter referred to as 'Ely'). WITNESSETH "WHEREAS, by an agreement dated March 1, 1947 the parties hereto, together with Willard J. Irwin, entered into a partnership agreement for the practice of medicine and surgery under the name of Acuff Clinic and on October 15, 1947 the said Willard J. Irwin retired from said partnership and since said date the partnership of Acuff Clinic has been operated by the six parties named herein, and "WHEREAS, paragraph 18 of said partnership contract provides that any partner may retire from said partnership by giving the notice therein prescribed and the said Ely has notified said remaining partners of his desire to retire from Acuff Clinic *162 and it has been agreed that the resignation of James Barr Ely shall be effective as of September 1, 1950, and "WHEREAS, the parties have orally agreed as to the terms of the dissolution and the agreements to be performed by the remaining members of the Acuff Clinic on the one hand and James Barr Ely on the other hand, and this instrument is executed for the purpose of reducing to writing the agreements entered into by the parties. "NOW, THEREFORE, in consideration of the premises and the mutual covenants of the parties, it is agreed as follows: The Acuff Clinic Agrees: "1. To accept the retirement of James Barr Ely as a partner of Acuff Clinic, effective as of September 1, 1950. "2. To cause the books of the Acuff Clinic to be closed by its auditors, Homer K. Jones Co., immediately following the close of business on August 31, 1950, for the purpose of determining the interest of said James Barr Ely in said partnership as of said date. "3. The interest of the said James Barr Ely in the partnership as of September 1, 1950 will be paid to him by Acuff Clinic in equal monthly installments of One Thousand Dollars ($1,000.00) per month, the first installment to be due and payable as of *163 September 1, 1950, and thereafter an installment of $1,000.00 to be paid on the first day of each consecutive month until the entire amount due shall have been paid. The said indebtedness of Acuff Clinic to James Barr Ely shall be evidenced by a promissory note of the Acuff Clinic dated September 1, 1950 payable as above provided. Should the Acuff Clinic fail to pay any monthly installment subsequent to the tenth day of the month when the installment becomes due, then the said Ely may elect to accelerate the unpaid indebtedness and declare it due and payable. Said note shall be noninterest bearing, except that any installment paid subsequent to the due date will bear interest at 4% from the maturity date of said installment. "4. To indemnify and agree to hold the said James Barr Ely harmless from any liability by reason of said Ely having been one of the Lessees in that certain lease dated March 30, 1946 between Will D. Wright and Martha Wright McIntosh as Lessors, and the members of Acuff Clinic as Lessees, the said lease being for a period of twenty years beginning at midnight May 30, 1946 and covering the building No. 514 West Church Avenue, Knoxville, Tennessee. "5. To sell to *164 said Ely all of the articles of personal property, surgical instruments and equipment sold to Acuff Clinic by said Ely and in payment of which the Acuff Clinic executed its promissory note dated March , 1947 for $1600.00, payable to Ely, the said note to be surrendered to Acuff Clinic by the said Ely in full payment of the aforesaid articles of personal property. "6. To sell to the said Ely for the sum of $125.00 those articles of personal property which are now used by the said Ely in his treatment room and being part of the personal property formerly owned by Charles T. Miller and purchased by the Acuff Clinic from his Receiver. "7. To assume any and all accounts payable due from Acuff Clinic as of September 1, 1950 and to assume any promissory notes due to banks, individuals or equipment dealers, thus relieving the said Ely from any liability in any of said obligations by reason of his having been a member of the partnership at the time such obligations were contracted or any such notes were executed. The said Ely agrees: "1. To accept of Acuff Clinic all personal property, surgical instruments and equipment sold by Ely to Acuff Clinic in full satisfaction of that certain note *165 for $1600.00 dated March , 1947, given by Acuff Clinic to Ely in payment for said articles of personal property and to surrender said note to the Acuff Clinic in full payment of the aforesaid articles of personal property resold by Acuff Clinic to Ely. "2. To bargain, sell, transfer and assign to Acuff Clinic, or its members, all of his right, title and interest in and to that certain lease dated May 30, 1946 between Will D. Wright and Martha Wright McIntosh, as Lessors, and Herbert Acuff, Kyle C. Copenhaver, Bergein M. Overholt, James Barr Ely, Illard J. Irwin, Harry H. Jenkins and Park Niceley as Lessees, the said lease being for a period of 20 years, beginning midnight May 30, 1946 and covering building No. 514 West Church Avenue, Knoxville, Tennessee, and to execute an assignment therein to the parties of the first part upon their indemnifying the said Ely against any loss as provided in paragraph 4 herein. "3. To bargain, sell, transfer and assign to Acuff Clinic all of his interest, as of September 1, 1950, in and to the assets of Acuff Clinic. "Upon the completion of the audit of the books of Acuff Clinic as of September 1, 1950, the determination of the value of the interest *166 of Ely in the partnership shall be made on the same percentage basis as Ely were sharing profits as of August 31, 1950. The amount so determined will be set up on the books of the Acuff Clinic as a debt payable to said Ely and evidenced by a note for said amount, as provided in paragraph 3 on page 2 herein. The parties mutually agree: "1. That between the date of September 1st and September 20, the said Ely will continue the practice of his profession at the Acuff Clinic to the same extent and devoting the time required just as if he were still a member of the partnership, and all fees earned from patients treated by him will belong to the Acuff Clinic. At the conclusion of business on September 20, 1950 Homer K. Jones Co., as auditors of the Acuff Clinic, will compute the net profits of the Acuff Clinic for said period of twenty days and the said Ely will be entitled to receive as compensation for his services, for said period of twenty days, the percentage of net profits of Acuff Clinic which he would have been entitled to have received had he remained a member of said partnership following September 1, 1950. Such amount will be paid to Ely upon being determined by the auditors. *167 "It is the intention of the parties entering into this Agreement that the same will constitute and result in a complete termination of the membership of James Barr Ely in the partnership of Acuff Clinic as of September 1, 1950 and that subsequent to said date the relationship of debtor and creditor will exist between said parties as to the amount due Ely for his interest in said partnership, and the said Ely will be paid for services for the period of September 1st to September 20th, 1950 inclusive as provided in the paragraph above. "The agreement between the partners stipulated that the retiring partner would have his percentage of the active accounts. It is agreed an inactive account is one which has been bankrupt, an account which the debtor has died and left no estate, one on which there has been no payments during the past twelve months even though the debtor is still coming to the Clinic, and accounts that are known to be worthless regardless of age. It is further agreed that the inactive accounts will be turned over to the B. & C. Collection Agency and that the Clinic will send Dr. Ely 9.8% of this collection agency's check when received by the Clinic." * * *
Subsequent to *168 petitioner's submission of the notice of withdrawal referred to above, the partnership's treasurer requested Keeler, an employee of Homer K. Jones Co., auditors, who did the accounting and auditing work for the Acuff Clinic from 1949 to 1953, to make a determination of the amount to be paid petitioner upon his withdrawal from the partnership. Keeler was furnished the partnership agreement to aid him in reaching such determinaion. He computed the amount payable to petitioner upon his withdrawal as follows: Statement of Income and Expense of Acuff Clinic
For Period Beginning January 1, 1950 and Ending August 31, 1950
Per Homer K. Jones Co., Auditors, Knoxville, Tenn.
Income: Professional Services: Cash Collections
$310,250.60
75% of active uncollected fees
142,495.74
$452,746.34
Domiciliary Care
32,875.50
Pharmacy - Net Income
2,401.37
Rent collected from dental department
1,496.33
Other miscellaneous income
503.74
Total Income
$490,023.28
Expenses: Cash expenses per books
$165,778.87
Expenses accrued, applicable to
period ended August 31,
1950: Depreciation
$ 10,783.94
Salaries
3,197.20
Supplies and other expenses
10,483.70
Interest on partners' notes at 4%
8,120.00
Total accrued expenses
$ 32,584.84
Total expenses
$198,363.71
$291,659.57
Dr. J. B. Ely: 9.89% X $291,659.57
$ 28,845.13
Add
1,953.46 *
$ 30,798.59
Less
11,000.00 **
$ 19,798.59
*169 Petitioner's distributive share of the partnership profits as computed on the cash basis for the period January 1, 1950 to August 31, 1950 amounted to $16,908.41. By indenture dated September 1, 1950, petitioner conveyed to the remaining five partners of the Acuff Clinic all of his interest in the lease to the premises occupied by the partnership in consideration of $1.00 and the assumption by the remaining partners of all liabilities and obligations under said lease, including the payment of rent, taxes and insurance premiums. In connection with petitioner's withdrawal from the partnership, an agreement dated October , 1950, was executed by petitioner and the remaining members of the partnership, the pertinent portions of which are as follows: * * *
"WHEREAS, the parties hereto entered into a dissolution of the partnership of Acuff Clinic as to the interest therein of James Barr Ely by a written agreement dated August 31, 1950 and "WHEREAS, pursuant to paragraph 2 of said Agreement, the said Homer K. Jones & Co. Auditors, closed the books *170 of Acuff Clinic as of August 31, 1950 and determined the interest of James Barr Ely as of said date to be the sum of Nineteen Thousand Seven Hundred Ninety-Eight & 59/100 Dollars ($19,798.59) and "WHEREAS, pursuant to said agreement, the Acuff Clinic has paid to the said Ely the sum of One Thousand One Hundred Forty-Nine and 70/100 Dollars ($1,149.70) in full compensation for his services for the period September 1st to September 20, 1950 inclusive and has likewise paid to him the sum of $1,000.00 to be applied as a credit on the amount of $19,798.59. "NOW, THEREFORE, for the purpose of fulfilling the covenants of the parties, it is agreed as follows: "1. Acuff Clinic contemporaneously with the execution of this agreement delivers to said Ely its promissory note dated September 1, 1950, for the principal sum of $19,798.59, payable in accordance with the terms of said contract, which the said Ely accept in full payment and satisfaction of the share of the interest of Ely in the Acuff Clinic as of midnight August 31, 1950 except alone as to the interest of Ely in the old charged-off accounts due Acuff Clinic, which accounts are to be collected in accordance with the last paragraph of *171 the aforesaid contract and distribution of any collections are to be made to Ely of 9.8% of said net collections as the same are received from the collection agency. "2. The said Ely acknowledges receipt herewith of the check of Acuff Clinic in the sum of $1,000.00, the payment of installment due October 1, 1950 on said note. "3. The said Ely agrees forthwith to credit the aforesaid note of $19,798.59 with the payment due September 1, 1950 previously paid to him and with the payment due October 1, 1950 herewith made, leaving the unpaid principal of said note the sum of $17,798.59 as of the date of the execution of this contract. "4. The said Ely acknowledges receipt of the check of Acuff Clinic payable to him in the sum of $1,149.70, previously paid him for professional services between the dates of September 1st and September 20, 1950, inclusive, and the said Ely accepts said sum in full payment of said services rendered by him to the Acuff Clinic. "5. The said Ely has contemporaneously herewith executed and delivered to the Acuff Clinic an assignment of his interest in and to that certain lease dated May 30, 1946 between Will D. Wright and Martha Wright McIntosh as Lessors, and *172 the members of Acuff Clinic as Lessees, the said lease being for a period of twenty years beginning midnight May 30, 1946 and covering building No. 514 West Church Avenue, Knoxville, Tennessee, the said assignment being executed pursuant to the terms of said agreement and in consideration of the said Acuff Clinic and the members therein agreeing to indemnify the said Ely from all of the covenants in said lease imposed upon said Ely by reason of his having been one of the original Lessees therein. "It is the intention of the parties entering into this agreement that upon the execution of the same that the said James Barr Ely's interest in the partnership of the Acuff Clinic terminated as of September 1, 1950 except as to the old accounts receivable as provided in said contract, and that following said date of September 1, 1950 the relationship of debtor and creditor was created between the parties and that the said Ely accepts said note for $19,798.59 as full payment of his interest in said partnership." * * *
The promissory note dated September 1, 1950, in the amount of $19,798.59, mentioned in said Agreement, was never in fact executed and delivered to petitioner. During the years *173 1950 to 1952, inclusive, the partnership paid petitioner the following amounts of the $19,798.59 payable in connection with his withdrawal from the partnership: Year
Amount
1950
$ 4,000.00
1951
12,000.00
1952
3,798.59 On his income tax returns for the years 1950, 1951, and 1952, petitioner reported such amounts as amounts received from the sale of a capital asset held more than six months. In his notice of deficiency respondent adjusted petitioner's reported income from the partnership for the year 1950 as follows: Adjustments to Net Income
Net income as disclosed by return
$10,075.17
Add: (a) Partnership income
$18,886.44
* * *
Explanation of Adjustments
(a) It has been determined that: Your distributive share of the profits of the partnership, Acuff
$16,908.41
Clinic, computed on the cash basis for the period ending August
31, 1950 was
Salary you received from the partnership from September 1, 1950 to
1,149.70
September 20, 1950, inclusive, was
Interest you received on partnership investment represented by
1,008.53
partnership note to you of $7,500.00 was
Your share of collections on old accounts receivable of
170.08
partnership was
Your share of the excess of the partnership net income computed on
11,936.72
an accrual basis for the period ending August 31, 1950
($28,845.13) over your share of the partnership net income
computed on a cash basis for the period ending August 31, 1950
($16,908.41) was
Such amount represents your share of certain fees for professional
services and was included in a note for the face amount of
$19,798.59 received by you in 1950
Your taxable income from Acuff Clinic for the year 1950
$31,173.44
In your income tax return for the taxable year ended December 31,
1950, you reported income from this partnership as follows: Ordinary income -
Schedule B - Interest income
$ 1,008.00
Schedule G - Partnership income
$9,200.00
Old accounts
79.00
9,279.00
$10,287.00
Capital gain - Schedule D - $4,000.00 (only
2,000.00
$2,000.00 taken into account)
Taxable income that you reported from Acuff
$12,287.00
Clinic
Net of above (increase in your net income as
$18,886.44
determined herein)
Accordingly your net income has been increased in the amount of $18,886.44.
Sections 22(a) and 182(c) of the Internal Revenue Code.
*174 A distribution of ordinary income to petitioner in the amount of $31,173.44 was reported by the partnership for the year 1950. Petitioner reported net income in the amount of $10,075.17 for the year 1950. Prior to the year 1950 the petitioner knew that he would receive interest from United States Bonds in the amount of $625 during 1950. Petitioner did not file a declaration of estimated tax or pay an estimated tax for the year 1950. Petitioner consulted his brother, Myron R. Ely, who was an attorney, in the latter part of 1949 concerning the filing of a declaration of estimated tax for the taxable year 1950. Myron prepared tax returns for some of his regular clients and subscribed to a tax law reporter service. Myron advised petitioner that if he would not have any income he would not have to file such declaration. Petitioner and Myron had several conversations concerning the filing of such declaration by petitioner during the year 1950 and specifically discussed this matter in the latter part of October 1950. Byron was aware that a declaration of estimated tax for the year 1950 could be filed on March 15, June 15, and September 15 of the year 1950 and on January 15, 1951. In considering *175 the question of petitioner's having to file a declaration of estimated tax for the year 1950, Myron considered the year as a whole rather than isolated periods during the year. Myron advised petitioner that he would not have to file a declaration of estimated tax for the year 1950. Opinion This case involves the tax treatment to be accorded a partner, under the Internal Revenue Code of 1939, upon his retirement or withdrawal from a partnership, the operation of which was thereafter continued by the remaining partners. The Committee on Ways and Means of the House of Representatives characterized such treatment as "among the most confused in the entire tax field," [1] and undertook to, and did much to clarify the situation in the Internal Revenue Code of 1954. [2] As will hereinafter appear, however, the Court decisions under the 1939 Code continue to be conflicting, or to say the least, confusing. Petitioner and six other doctors, by written agreement dated March 1, 1947, formed a partnership to engage in the practice of *176 medicine and operate a clinic in Knoxville, Tennessee, to be known as the "Acuff Clinic." Each of the partners was to contribute $7,500 to the initial operating capital, for which he was to receive a promissory note of the "Acuff Clinic," payable from surplus profits, on or before three years from date, with interest thereon at the rate of 4 per cent. A 20-year lease of the premises in which the partnership has since continuously been operated, which had previously been executed in their individual capacities by each of the partners, was made an asset of the partnership with each partner entitled to its benefits and subject to its liabilities. It was further provided that all property thereafter purchased for the use and operation of the clinic, such as furnishings, equipment and the like, should be considered as capital assets of the partnership and "belong to each of the partners in equal shares." The term of the partnership was to continue until June 1, 1966, unless dissolved prior thereto by mutual agreement. Neither the death nor withdrawal of a partner should "of itself dissolve the partnership." Any partner was permitted to retire, however, upon the giving of 6 months' notice *177 of his intention to do so, and the agreement contained provisions for the determination of a partner's interest upon his death or retirement. Among other things, it was provided that upon the retirement of any partner, an account or statement should be made "of his net share of the capital assets and effects of the partnership, and of all unpaid interest and profits belonging to him up to the time" of his retirement. For this purpose, a valuation was to be made "of any assets or effects requiring a valuation and the amount so ascertained to be due and owing" to such partner paid to him. In determining such valuation, no valuation was to be placed on "good will as a partnership asset," active accounts receivable were to be "computed at 75% of their face value," and equipment was to be "depreciated 10% per year from the date of purchase by the Clinic." The Executive Committee was authorized to determine the conditions under which the retiring partner was to be released from his obligation, "to accrue in the future," under the lease referred to above, and the partnership was to have 2 years in which to make payment of the amount determined to be due to him. Petitioner gave notice of his *178 intention to withdraw from the partnership on January 1, 1950. Thereafter, on May 16, 1950, 3 notes aggregating $7,500, which he had received upon contributing to the initial operating capital of the partnership, together with interest in the amount of $1,008.53, were paid by the Acuff Clinic. On August 31, 1950, a written agreement, incorporating the "terms of the dissolution" previously orally agreed upon by the parties, was entered into between the remaining partners and petitioner. It was agreed that petitioner's retirement as a partner would be effective September 1, 1950, and that the books of the partnership would be closed by its auditors, Homer K. Jones Co., as of the close of business August 31, 1950, for the purpose of determining the interest of petitioner in the partnership. Such interest was to be paid to petitioner in equal monthly installments beginning September 1, 1950, and the indebtedness evidenced by a promissory note which was to be noninterest bearing except that any installment should bear interest at the rate of 4 per cent from its due date. Petitioner agreed to transfer and assign all his right, title and interest in the leased premises to Acuff Clinic and *179 Acuff Clinic agreed to indemnify and hold him harmless from any liability under said lease. Acuff Clinic also agreed to assume, and relieve petitioner from liability on, all accounts payable as well as notes due banks, individuals, or equipment dealers by the clinic as of September 1, 1950. It was further agreed that Acuff Clinic would sell, and petitioner would purchase certain personal property including surgical instruments and equipment which petitioner had sold to the Clinic in March 1947, in consideration of the surrender by petitioner of the note in the amount of $1,600 which petitioner had originally received from the Clinic in payment for such property. Acuff Clinic also agreed to sell to petitioner, for the sum of $125, certain other articles of personal property then being used by petitioner in his treatment room. Having thus set forth the "terms of the dissolution," petitioner agreed "To bargain, sell, transfer and assign to Acuff Clinic all of his interest, as of September 1, 1950, in and to the assets of Acuff Clinic." A statement of income and expenses of the partnership for the period January 1 to August 31, 1950, was prepared by an employee of Homer K. Jones Co., the *180 auditing firm which handled the accounting and auditing work for the partnership, and the amount due and payable to petitioner as of August 31, 1950, was determined. The income of the partnership for the period January 1 to August 31, 1950, was determined by adding 75 per cent of the active uncollected fees to the cash collections for professional services and income from domiciliary care, net income of the pharmacy, rent collected from the dental department and miscellaneous income. Expenses were determined by accruing depreciation, salaries, supplies and interest on partnership notes for the period and adding such accruals to cash expenditures. Net income for the period was then determined to be $291,659.57. Of the net income 9.89 per cent, or $28,845.13, was determined to be petitioner's pro rata share of the net income of the partnership for the period January 1 to August 31, 1950. To this amount $1,953.46, representing petitioner's capital account as of January 1, 1950, was added, and $11,000, the amount of petitioner's withdrawals during the period, was deducted. The remainder, $19,798.59, was determined to be the amount due and owing to petitioner. On September 1, 1950, petitioner *181 conveyed his interest in the lease to the remaining partners and, on October -, 1950, by written agreement acknowledged receipt contemporaneously therewith of the promissory note of the Acuff Clinic dated September 1, 1950, in the amount of $19,798.59 and 2 payments thereon in the amount of $1,000 each as of September 1 and October 1, 1950, respectively, which note petitioner "accepts in full payment and satisfaction of the share of the interest" of petitioner in Acuff Clinic as of August 31, 1950, except as to certain old charged-off accounts upon the collection of which he was to receive 9.8 per cent of net collections. The "Agreement" also recited that contemporaneously therewith petitioner executed and delivered an assignment of his interest in the lease although he had previously conveyed such interest on September 1, 1950. The above mentioned note was never in fact executed and delivered to petitioner. Petitioner's position is that the entire $19,798.59 received by him upon his retirement or withdrawal from the Acuff Clinic was received as consideration for the sale of his partnership interest, that such interest was a capital asset held for more than 6 months and, therefore, *182 the entire amount is subject to treatment as long-term capital gain under the provisions of section 117 of the Internal Revenue Code of 1939. Respondent concedes that the sale of a partnership interest is a sale of a capital asset subject to the provisions of section 117. See G.C.M. 26379, C.B. 1950-1 §§ 58, 59. [3] He contends, however, that $1,953.46, representing the amount in petitioner's capital account as of December 31, 1949, was paid him for his partnership interest and that the remainder, $17,845.13, represented petitioner's share of the partnership profits ($28,845.13), less withdrawals in the amount of $11,000, for the period January 1 to August 31, 1950, and is therefore taxable as ordinary income under the provisions of sections 22(a)[4] *183 and 182 [5] *184 of the Internal Revenue Code of 1939. We agree with respondent that $17,845.13 of the amount received by petitioner upon his retirement or withdrawal from the Acuff Clinic represents petitioner's pro rata share, less withdrawals, of the profits of the partnership for the period January 1 to August 31, 1950, and as such is taxable as ordinary income. It has been held by this and other Courts that the consideration received by a withdrawing partner upon the sale of his partnership interest is taxable as ordinary income to the extent it includes the distributable share of such partner in the profits of the partnership for that portion of the partnership's taxable year preceding the date of sale. LeSage v. Commissioner, 173 F. 2d 826 (C.A. 5, 1949), affirming on this point a Memorandum Opinion of this Court; Louis Karsch, 8 T.C. 1327; George F. Johnson, 21 T.C. 733; United States v. Snow, 233 F. 2d 103 (C.A. 9, 1955), certiorari denied 350 U.S. 831; *185 Leff v. Commissioner, 235 F. 2d 439 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court; Tunnell v. United States, 259 F. 2d 916 (C.A. 3, 1958). See also Helvering v. Smith, 90 F. 2d 590 (C.A. 2, 1937), reversing a Memorandum Opinion of this Court; B. Howard Spicker, 26 T.C. 91; Doyle v. Commissioner, 102 F. 2d 86 (C.A. 4, 1939), affirming 37 B.T.A. 323; Trousdale v. Commissioner, 219 F. 2d 563 (C.A. 9, 1955), affirming 16 T.C. 1056. Petitioner seeks to avoid the force of the above cases by arguing that "the purchase price agreed to be paid was a sum certain, payable at all events, having no relation to or aspect of a distributive share of partnership income," and that Swiren v. Commissioner, 183 F. 2d 656 (C.A. 7, 1950), reversing a Memorandum Opinion of this Court, certiorari denied 340 U.S. 912, and Meyer v. United States, 213 F. 2d 278 (C.A. 7, 1954), should be followed and applied in this case. See also United States v. Shapiro, 178 F. 2d 459 (C.A. 8, 1949), and the recent case of United States v. Donoho, 275 F. 2d 489 (C.A. 8, March 7, 1960); but compare Hulbert v. Commissioner, 227 F. 2d 399 (C.A. 7, 1955), [6] affirming a Memorandum Opinion of this Court. *186 We do not, however, view the facts to be as petitioner argues. As the evidence, set forth at length in our findings and summarized above, indicates, with the exception of $1,953.46 which was in petitioner's capital account as of January 1, 1950, the entire amount paid petitioner represented his pro rata (9.89 per cent) share of the net income of the partnership for the period January 1 through August 31, 1950, less the amount of his withdrawals during that period. Petitioner's complaint that in computing his interest the accountant did not include his equity in the partnership assets is, in the first place, addressed to the wrong forum. In any event, it appears that petitioner's capital account was derived from the balance sheets *187 included in the information returns (Form 1065) filed by the partnership, and that the net income of the partnership (and petitioner's pro rata share thereof) was computed in the manner prescribed by the partnership agreement. This brings us to consideration of whether, notwithstanding the fact that the amount paid petitioner was comprised, to a substantial degree, of petitioner's pro rata share of the net profits or income of the partnership for that portion of the taxable year preceding the date of sale, we should follow the decisions of the Seventh and Eighth Circuits in the Swiren, Meyer, Shapiro and Donoho cases cited above. These cases stand generally for the proposition that under the applicable provisions of the Internal Revenue Code of 1939 the sale of a partner's interest in a partnership is the sale of a capital asset regardless of the nature of the partnership properties and that the entire amount received by the retiring partner is subject to the capital gain (or loss) provisions of section 117. While some factual differences exist we are unable to reconcile in principle the Swiren, Meyer, Shapiro, and Donoho cases, supra, with the other cases cited above. As recently *188 observed by the Eighth Circuit in the Donoho case, the "hoped for uniformity" in the application of the law relating to the tax treatment to be accorded a partner, under the Internal Revenue Code of 1939, upon his retirement or withdrawal from a partnership, has not been attained. In our opinion, insofar as the question here presented is concerned, the decisions in the LeSage, Karsch, Johnson, Leff, Tunnell, Smith, Spicker, Doyle, and Trousdale cases, supra, represent the better reasoning. Chris J. Sherlock, 34 T.C. - (June 20, 1960). Accordingly, we hold that $17,845.13 of the amount received by petitioner upon his retirement or withdrawal from the Acuff Clinic is taxable as ordinary income. The decision of the Court of Appeals for the Sixth Circuit in Walter L. Berry, et al. v. United States, 267 F. 2d 298 (C.A. 6, 1959), does not, in our opinion, require a different conclusion. In that case, even though anticipated profits to be received by a partnership were an element considered in placing a value on the partnership interest sold, it was held that the taxpayer realized capital gain from the sale of his interest to another partner. There, however, the partnership used the completed *189 contract method of accounting for profits. At the time of sale, the current contract was only 76.5 per cent completed and the ultimate profit from the completed contract could not have been determined. The situation in the present case is quite different from that in the Berry case. Here the income chargeable to petitioner was income earned by the partnership at the time of sale, definitely ascertained in amount. The fact that accounts receivable were included in the computation is not material. Helvering v. Smith, supra; Tunnell v. United States, supra; B. Howard Spicker, supra. As was recognized by the Sixth Circuit in the Berry case, "Income already earned by the partnership, to which the selling partner was legally entitled to his partnership share, was not changed into a capital asset by the sale." The next issue is whether the entire $17,845.13 is taxable to petitioner in the year 1950 as determined by respondent. On reply brief, respondent states he agrees with petitioners "that if the Court should find that the note was not delivered to Dr. Ely that the monthly payments received by Dr. Ely in 1950, 1951, and 1952 would be taxable to him as ordinary income in the year received *190 or as capital gains in the year received if the Court should find that all or a part of the proceeds received by petitioner represented capital gains." We have found as a fact that the promissory note dated September 1, 1950, in the amount of $19,798.59, mentioned in the agreement of Oct. , 1950, was never in fact executed and delivered to petitioner, notwithstanding the recital in such agreement that it was being delivered "contemporaneously" therewith. It is to be noted that the agreement also recited that "contemporaneously" therewith petitioner executed and delivered an assignment of his interest in the lease whereas he had previously conveyed such interest on September 1, 1950. Petitioner testified such a note was not in fact delivered to him and Tom Williams, bookkeeper and office manager of the Acuff Clinic during the period in question, testified he could not recall such a note as having been executed or recorded on its books. Respondent, on whom devolved the duty of going forward with the evidence in the face of such testimony, offered no evidence to refute it. In view of respondent's concession our finding that no such note was executed or delivered to petitioner disposes *191 of this issue. We might add, however, that even if such a note had been executed and delivered, it would, in our opinion, have been no more than evidence of indebtedness and not payment. There is no suggestion it was to be secured by collateral; it was to be non-interest bearing, except on default of monthly payments; and it merely carried out the intent of the parties as shown by their agreements that the Acuff Clinic should have two years within which to pay petitioner. Cf. Robert J. Dial, 24 T.C. 117; Jay A. Williams, 28 T.C. 1000. The next issue involves respondent's determination of additions to tax for the year 1950 under the provisions of sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939. [7] *193 Section 294(d)(1)(A) is applicable where a taxpayer, without reasonable cause, fails to file a declaration of estimated tax as provided by section 58, Internal Revenue Code of 1939. Petitioner does not deny that under section 58 he was required to file a declaration of estimated tax for the year 1950. He contends, however, that the respondent's determination under section 294(d)(1)(A) is improper because his failure to file a declaration of estimated tax was due *192 to his reliance upon the advice of counsel. Petitioner's position cannot be sustained. We have held that reliance upon the advice of reputable counsel may constitute reasonable cause for failure to file a tax return. C. R. Lindback Foundation, 4 T.C. 652, affd. per curiam 150 F. 2d 986; Garrett Holding Corp., 9 T.C. 1029. However, reliance upon the advice of counsel does not constitute reasonable cause where the record fails to show that such advisor was qualified and fully informed of all the facts. Rene R. Bouche, 18 T.C. 144. This is not a case where there could be any substantial doubt as to the necessity of filing a declaration of estimated tax by petitioner. To the contrary, it is conceded that he comes within the provisions of section 58. The record discloses that petitioner must have reasonably expected to receive gross income not subject to withholding in excess of $600 in 1950, since he knew he would receive interest from Government bonds amounting to $625. Furthermore, prior to August 31, 1950, he withdrew $11,000 from the partnership. The record does not disclose that petitioner informed *194 his brother of these facts. In light of these circumstances, it appears that petitioner's failure to file a declaration of estimated tax was due to reliance upon an advisor to whom insufficient information was disclosed, or who was unfamiliar with the requirements of the taxing statutes. Neither is sufficient excuse. Tarbox Corporation, 6 T.C. 35; Rene Bouche, supra.Accordingly, we hold that petitioner is liable for the additions to tax imposed by section 294(d)(1)(A). In the light of the Supreme Court's recent decision in Commissioner v. Acker, 361 U.S. 87, however, petitioner is not liable for any additions to tax under section 294(d)(2). Decision will be entered under Rule 50. Footnotes
*. Amount of petitioner's capital account on January 1, 1950. ↩
**. Amount of petitioner's drawings for period from January 1, 1950 to August 31, 1950.↩
1. House Report No. 1337, 83rd Cong., 2d Sess., p. 65.↩
2. See discussion in Tunnell v. Commissioner, 148 F. Supp. 689, 695-6, affd. 259 F. 2d 916↩ (C.A. 3, Oct. 8, 1958).
3. Although recognizing that a sale of a partnership interest is to be treated as a sale of a capital asset, the ruling explicitly states that "payments made to a retiring partner which represent his distributive share of earnings for past services should be treated as ordinary income rather than the proceeds derived from a sale of his interest." ↩
4. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * 5. SEC. 182. TAX OF PARTNERS. In computing the net income of each partner, he shall include, whether or not distribution is made to him - (a) As part of his gains and losses from sales or exchanges of capital assets held for not more than 6 months, his distributive share of the gains and losses of the partnership from sales or exchanges of capital assets held for not more than 6 months. (b) As part of his gains and losses from sales or exchanges of capital assets held for more than 6 months, his distributive share of the gains and losses of the partnership from sales or exchanges of capital assets held for more than 6 months. (c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183(b).↩
6. It has been suggested that in Hulbert v. Commissioner, the Seventh Circuit overruled its previous opinions in the Swiren and Meyer cases. See the comment of the Second Circuit in Leff v. Commissioner, supra, and the discussion of the Ninth Circuit in United States v. Snow, supra. We are inclined, however, to agree with the District Court in Tunnell v. United States, 148 F. Supp. 689↩, that the Swiren and Meyer cases were not overruled by the Hulbert case.
7. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - (1) Failure to File Declaration or Pay Installment of Estimated Tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66 2/3 per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *